UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| S. USA LIFE INSURANCE COMPANY, INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>)<br>THOMAS J. LEMMEN )<br>)<br>Defendant. ) | CASE NO.: 2:22-CV-263<br><br>JURY TRIAL DEMANDED |

**<u>VERIFIED COMPLAINT FOR DAMAGES, TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>**

Plaintiff, S.USA Life Insurance Company, Inc. ("S.USA"), by counsel, for its Complaint against Defendant, Thomas J. Lemmen ("Lemmen"), states as follows:

## I.   INTRODUCTION

S. USA believes that Lemmen, an independent insurance agent, perpetrated a scheme ("Advance Commission Scheme") to defraud S.USA and enrich himself by submitting false or fraudulent applications for life insurance policies issued by S.USA ("Sham Applications"). This Advance Commission Scheme resulted in the payment of substantial commissions and bonuses to Lemmen under false pretenses.

## II.   THE PARTIES

1. S.USA is a corporation organized and existing under the laws of Arizona, with its statutory home office at 815 North 1st Avenue, Phoenix, Arizona

1

85003; and its principal executive office at 4415 Pheasant Ridge Road, Suite 300, Roanoke, VA 24014. S.USA is thus a citizen of Arizona and Virginia for jurisdictional purposes.

2. Defendant Thomas Lemmen is a resident of the State of Indiana.

### III. JURISDICTION AND VENUE

3. Jurisdiction is proper under 28 U.S.C. § 1332(a) because this action is between citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

4. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (3) because a substantial part of the events, acts and omissions giving rise to S. USA's claims occurred within this judicial district and defendant is subject to personal jurisdiction in this district.

### IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 5 above.

6. S.USA is a stock life insurance company, authorized to transact the business of life insurance in 45 states. S.USA is authorized by the Insurance Commissioner of the State of Indiana to transact the business of life insurance.

7. S. USA markets its insurance products to consumers nationwide through contracted and appointed independent agents to whom it pays commissions.

8. Lemmen is, or at all times relevant was, an independent insurance agent contracted and appointed with S.USA to solicit applications for life insurance in Indiana and Texas.

9. On or about March 24, 2020, Lemmen entered into a contract with S. USA ("the Contract"). (See Exhibit A, Contract). The Contract included a First-Year Commission Advancing Addendum ("Advancing Addendum") (See Exhibit B, First-Year Commission Advancing Addendum).

10. Under the Contract, S.USA agreed to appoint Lemmen to solicit applications for its life insurance policies and to pay him commissions on business he submitted, subject to certain terms and conditions.

11. In accordance with the Contract, S.USA would pay Lemmen a commission when a policy was issued as a result of an application for an insurance policy on which Lemmen was identified as the writing agent.

12. Pursuant to the Advancing Addendum, the initial commission payment made by S.USA upon the issuance of the policy would include an advanced payment – known as an "advance" - of a certain portion of the total commission that would be due for the first year of the insurance policy, assuming all first-year premiums were ultimately paid to S.USA by the customer. Under the terms of the Advancing Addendum, "[a]mounts advanced neither decrease nor increase the amount of compensation ultimately payable" to the agent, and the agent remains "liable to [S.USA] for any overpayment of commission that occurs as a result of advances." (Exhibit B, Advancing Addendum §4.) If the amounts

3

advanced are not ultimately "earned" back during the policy's first year through the payment of premiums by the customer – because the policy was later rescinded, processed as "not taken," or lapsed/terminated within the first year -- the Contract and the Advancing Addendum allow S.USA to withhold any compensation otherwise payable to the agent to repay any unearned advanced commissions. See Exhibit A, Contract, V(B); Exhibit B, Advancing Addendum, §6.  This is known as a commission "chargeback" or "offset." The Contract and the Advancing Addendum also allow S.USA to demand immediate repayment of all unearned first-year commissions that have been advanced. See Exhibit A, Contract, VI(C); Exhibit B, Advancing §4.

13. For the products sold by Lemmen, commission payments are heavily weighted in the first year of the policy, exceeding the amount of the premiums expected to be paid to S.USA by the customer in the first year. For example, in the case of the product that made up most of the business submitted by Lemmen, the annualized first-year commission was 140% of the premiums to be paid to S.USA by the policyholder in the first year of the Policy.

14. Per the Advancing Addendum in place during the period at issue, S.USA agreed to advance nine (9) months of the total first-year commission payable to the agent, up to a total of $2500 per policy, due on any policy issued as a result of an application submitted by Lemmen.

4

15. S.USA also had a bonus program in place during the relevant time period that would pay qualifying agents (including Lemmen) bonuses based on annualized premiums associated with policies settled within each calendar quarter as a result of applications submitted by the agent.

16. Since April 2020, S.USA has issued over 2,400 life insurance policies as a result of applications submitted by Lemmen, making him S. USA's most prolific individual life insurance agent nationwide.

17. As of September 12, 2022, Lemmen has an outstanding debt to S.USA of $1,030,919.54 owed under the terms of the Contract and Advancing Addendum. From 2020 to present, S.USA also paid Lemmen bonuses totaling $304,579.11 based on the annualized premium expected for business he submitted.

18. All of the applications for life insurance submitted by Lemmen were submitted electronically using S.USA's electronic application sales tool (e-application). E-application is an online tool designed to be used for sales in which the agent and customer meet face-to-face to complete an on-line application for "simplified issue" insurance, meaning the underwriting decision is based on answers to certain health questions on the application and the applicant's health and prescription drug history, if any, as reported to S. USA electronically by certain consumer reporting agencies. Once the application is completed and e-signed by the agent and customer, the e-application engages an automated program that allows for an instant underwriting decision at point of sale. For

5

applicants who wish to pay their premiums by recurring automatic electronic fund transfer (EFT), a payment authorization form identifying the bank account from which the premiums are to be paid and authorizing such recurring payments by the applicant as accountholder is also completed and e-signed by the applicant as part of the e-application process. The results and completed application are then transferred electronically to S.USA, which issues a policy based on the e-application. The issuance of the policy triggers any advance commission payment in place under the writing agent's contract with S.USA. All applications submitted by Lemmen state that they were signed by the applicant and Lemmen in Indiana.

19. S. USA became concerned about Lemmen's business given his high advance commission balance and a number of other unusual trends.

20. Based on these concerns, S.USA initiated a review of the business submitted by Lemmen and, to date, has found multiple indicators suggesting that Lemmen has been submitting fraudulent e-applications for the purpose of receiving commission payments from S.USA under false pretenses.  These include:

   a. Submission of applications on individuals, or applications designating beneficiaries, who were deceased at the time the application was submitted – see ¶¶ 21-23.

    b. The repeated use of a series of bank accounts that do not appear to be tied to the applicant to pay premiums for multiple, unrelated policies – see ¶¶ 24-28.

    c. The use of contact information (address, phone number, and email address) that do not appear to be tied to the applicant – see ¶¶ 24-27-

    d. Submission of multiple applications on the same insureds – see ¶¶ 29-30.

    e. Evading detection by having policies mailed directly to him for supposed personal delivery to the applicant versus being mailed directly to the address stated on the application – see ¶ 28.

21. S. USA's investigation, which is ongoing, has to date revealed fourteen (14) instances in which Lemmen submitted applications for life insurance policies, purporting to have been signed by the applicant with e-signature, for people who were deceased prior to the date the applications were so signed. Specifically:

    a. Lemmen submitted three applications for life insurance policies for Tina Gipson with application dates of May 16, 2022, May 21, 2022, and August 10, 2022. However, according to public records, Ms. Gipson died on April 4, 2021, almost a year prior to her first application.

    b. Lemmen submitted three life insurance applications for Charles Webster with application dates of April 26, 2022, May 4, 2022 and

7

May 10, 2022. However, according to public records, Mr. Webster died prior to the first application on March 20, 2022.

c. Lemmen submitted three life insurance applications for Doris Abreu with application dates of November 17, 2021, January 18, 2022, and February 25, 2022. However, according to public records, Ms. Abreu died on September 7, 2020, over a year before her first application.

d. Lemmen submitted four life insurance applications for Minnie Murray with application dates of June 2, 2022, two on June 24, 2022, and August 4, 2022. However, according to public records, Ms. Murray died November 4, 2018, four years before her first application.

e. Lemmen submitted a life insurance application for Diane Cornelius on July 29, 2022. However, according to public records, Ms. Cornelius died on June 23, 2022, a month before her application was taken.

22. Relatedly, Lemmen also submitted two life insurance applications for Branislav Blecic, one on May 12, 2020, and one on August 4, 2021. Although according to public records the insured died on January 8, 2022, S.USA continues to receive premiums on the policies issued as a result of these applications and no claims have been made on the policies. Moreover, the beneficiary listed on Mr. Blecic's applications was

8

Gojko Blecic, identified on the application as the insured's son. Upon information and belief, Gojko died in 2019, prior to the first application.

23. In all of the above cases, the applications were approved, policies were issued, and Mr. Lemmen was paid advance commissions.

24. S. USA also has identified 116 different bank accounts used over five times – and up to 12 times - each to pay premiums by EFT for multiple policies.  S. USA has identified close to 800 policies for which these repeat bank accounts were used for automatic recurring premium payments.  These recurring premium payments were supposedly authorized by e-signature of the applicants named on the applications. In the course of its investigation, S.USA has identified the following as indicators that many, if not all, of the applications submitted using the repeat use bank accounts are Sham Applications:

   a. The same bank account number is used to authorize premium payments on numerous policies insuring different people who do not all live at the same address (even according to the addresses stated on the application) and do not all appear to be related.

   b. Using a database available to S. USA, S.USA was not able to validate any of the applicants listed on the applications as the accountholder for these bank accounts.  In other words, the applicants for applications specifying these bank accounts as the account from which premium payments were to be paid, and e-

9

signing forms authorizing the same, do not appear to be the owners of those accounts.

c. Using a database available to S.USA, S.USA was not able to validate any of the mailing addresses provided on any of the applications for which one of these repeat use bank accounts was used as an address known to be used by the applicant named on the application. Many of the addresses stated on these applications are linked to strip malls or other business locations.

d. Applications using the same repeat use bank account number also typically identify the same phone number for the applicants across the applications. Many of these numbers appear to be invalid or disconnected.

e. Applications using the same repeat use bank account numbers also often state as the applicant's e-mail address one of several e-mail addresses that appear to be tied to Lemmen.

25. Until August 15, 2022, when S.USA invoked its rights under Section VI(C) of the Contract to direct all commissions payable to Lemmen be used to offset his advance commission balance, S.USA paid advance commissions to Lemmen upon issuance of each policy for which an application was submitted using one of these repeat use bank accounts.

26. Since August 15, 2022, S. USA has received additional applications specifying one or more of these repeat use bank accounts as the account from which automatic recurring premium payments are to be paid.

10

27. The indicators described above strongly suggest that Lemmen – potentially with the assistance of unknown accomplices -- was "fronting" fake applications using the names and social security numbers of real individuals, and then using these repeat use bank accounts to pay premiums for the same for a period of time, as part of a shell game scheme designed to maximize commission payments while evading detection.

28. S. USA's investigation has also revealed that Lemmen directed that S.USA mail all policies issued as a result of applications submitted by him to his address, rather than to the address of the policyholder listed on the applications.

    a. This is something S.USA allows an agent to choose, as certain agents like to deliver policies to their clients in person, but it is unusual for the product sold by Lemmen.

    b. In this instance, S.USA has reason to believe, based on its investigation, that Lemmen asked for policies to be delivered to him so that S.USA would not discover the Advance Commission Scheme in which he was engaged by, for example, returned mail or calls from people receiving policies in the mail in error.

29. S. USA's investigation has also revealed that Lemmen's book of business shows an unusually high frequency of multiple policies being issued to the same insured and in force at the same time. S.USA has reason to believe that this pattern of multiple policies issued to the same

person is an element of the Advance Commission Scheme, as it served to maximize his first-year commission earnings and maintain a steady flow of advanced commission and bonus payments.

30. Upon information and belief, Lemmen managed to keep this shell game going by continually increasing his application volume. In 2020, he submitted an average of approximately 47 applications per month. In 2021, this increased to approximately 82 applications per month. Before S.USA stopped paying him commissions on August 15, 2022, Lemmen averaged approximately 146 applications per month in 2022.

31. Based on the above, S.USA suspects that many of the applications submitted by Lemmen were either completed without the applicant's knowledge or consent and/or with the applicants serving as accomplices in some manner.

32. S. USA has incurred attorneys' fees and costs in pursuing this matter and will continue to do so.

### Count I- Fraud

33. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 32 above.

34. In engaging in the Advance Commission Scheme and causing plaintiff to issue policies based on Sham Applications, Lemmen knowingly and repeatedly made false representations to S. USA.

35. The actions of Lemmen fraudulently induced plaintiff to believe that the policies which they had issued were being sold to real, living individuals

who were seeking (and intending to pay premiums for) insurance coverage and had participated in the sales process and that he was therefore entitled to payment of commissions for those policies.

36. S. USA reasonably relied upon Lemmen's false representations to S. USA's detriment.

37. As a result of Lemmen's fraud, S. USA has been damaged by paying Lemmen commissions and bonuses on the policies issued as a result of the Sham Applications and hasincurred significant underwriting costs and lost profits, its damages in a total amount to be proven at trial.

### Count II- Constructive Fraud

38. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 37 above.

39. Lemmen was a trusted agent of S. USA and owed S. USA a duty to discharge his duties with the care an ordinarily prudent person in like position would exercise under similar circumstances.

40. S. USA relied upon Lemmen to fulfill his duty to discharge his duties with the care an ordinarily prudent person in like position would exercise under similar circumstances.

41. Through his conduct described above, Lemmen violated his duty to S. USA.

42. As a direct result of Lemmen's violation of his duties, S. USA has sustained damages in an amount to be proven at trial.

## Count III-Promissory Estoppel/Detrimental Reliance

43. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 42 above.

44. Lemmen promised and represented that he had solicited and delivered to the customer valid insurance policies.

45. In reliance on defendant's promises and representations, which reliance was reasonable, S.USA paid Lemmen ill-gotten bonuses and commissions.

## Count IV- Unjust Enrichment

46. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 45 above.

47. Defendant was paid undeserved commissions and bonuses by S. USA as a result of his Advance Commission Scheme.

48. The payment of such commissions by S. USA because of the wrongful conduct of Lemmen led to his unjust enrichment.

49. Defendant has been unjustly enriched at the expense and to the detriment of Plaintiff.

## Count V- Breach of Contract

50. S. USA realleges, and incorporates herein, each and every allegation contained in Paragraphs 1 through 49 above.

51. The Contract is a legally binding agreement between the parties. Pursuant to the Contract, S.USA received, or expected to receive, the honest services of Lemmen in selling its policies, while Lemmen received commission and bonus payments.

52. The Contract requires Lemmen to "fairly, truthfully, and properly represent the Company and its products and services; and faithfully perform, in an ethical and professional manner, all the duties within the scope of the appointment under this Contract."

53. Defendant breached the Contract by participating in the Advance Commission Scheme as alleged herein.

54. If Defendant had complied with Contract and not participated in the Advance Commission Scheme, S. USA would not have issued the policies issued as a result of the Sham Applications and would not have paid Defendant ill-gotten commissions and bonuses or incurred significant underwriting costs.

55. As a result of Defendant's breach of his Agreement, S. USA paid Lemmen ill-gotten commissions and bonuses and incurred significant underwriting costs, its damages in a total amount to be proven at trial.

### Count VI- Breach of Fiduciary Duty

56. S. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 55 above.

15

57. Because S. USA sells its insurance products to the consumer through independent agents, S. USA is dependent on, and places its trust and confidence in, its independent contracted and appointed agents.

58. Lemmen was a trusted agent of S. USA and, pursuant to the Contract, Lemmen agreed to "fairly, truthfully, and properly represent the Company and its products and services; and faithfully perform, in an ethical and professional manner, all the duties within the scope of the appointment under this contract" Exhibit A, p. 2, Section I. par. M)

59. As S. USA's fiduciary, Lemmen was duty-bound, among other things, to act in good faith and in the best interest of S. USA, and to refrain from putting his personal interests above those of S. USA.

60. Lemmen acted knowingly and with the specific intent to engage in the Advance Commission Scheme as alleged herein failed to act in good faith and in the best interests of S. USA and put his own personal financial interest in obtaining upfront commissions above his duty to S. USA.

61. As a direct and proximate result of the breaches of fiduciary duties owed to S. USA by Defendant, S. USA has suffered injury, harm, damages and losses in the form of undeserved and ill-gotten commission and bonusepayments, and has incurred significant underwriting costs for policies issued as a result of Sham Applications and is entitled to recover these damages from Lemmen Plaintiff in an amount to be proven at trial.

**Count VII- Punitive Damages**

62. USA realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 61 above.

63. Lemmen's conduct was intentional, oppressive, dishonest, grossly negligent, and not the result of mistakes of law or fact, honest errors of judgment, over-zealousness, mere negligence, or other such non-iniquitous human failings, as to make appropriate an award of punitive damages to Plaintiff in an amount sufficient to punish Lemmen and to dissuade him and others from similar conduct in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests judgment in its favor, together with the following relief:

A. An Order allowing expedited discovery;

B. Preliminary and permanent injunctions requiring Lemmen to:

- pay S. USA all outstanding debts plus interest owed to S. USA under the Contract,
- respond to the expedited discovery within 15 days, and
- produce for inspection and copying computer, cell phone, and other electronic devices used by himself and anyone working with him in conjunction with the solicitation of applications for S.USA's policies, including assistance with making appointments;

17

C. Preliminary and permanent injunctions prohibiting Lemmen from doing or causing others to do any of the following:

- destroying, deleting, or failing to maintain business, financial, and accounting records including bank records, which detail the disposition of payment to Lemmen from S.USA,

- directly or indirectly contacting S.USA's customers,

- accepting, transferring, alienating, encumbering and/or disposing of, or otherwise taking any action with respect to, monies received from S. USA or bank accounts used in connection with his Advance Commission Scheme, including any bank accounts used to make premium payments to S.USA,

- acting in any manner that is inconsistent with the Contract terms or to his fiduciary duties to S. USA,

- altering, erasing, deleting, any electronic or hard-copy materials including but not limited to emails and text messages containing information related to S. USA applications, customers, commission payments, and/or bonuses;

D. An award of compensatory damages in an amount to be determined at trial;

E. An award of attorney's fees and costs;

F. An award of treble damages and punitive damages; and

G. All other just and proper relief.

**JURY DEMAND**

18

Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P.38(b).

**VERIFICATION**

I, Russell Johnson, swear or affirm under the penalties of perjury that the factual statements in this Verified Complaint for Damages are true and accurate to the best of my knowledge, information and belief.

S.USA Life Insurance Company, Inc.

9-13-22
_____
Date

By: _____
Russell Johnson,
Vice President of Internal Auditing

Respectfully submitted,

By: /s/ Aimee Rivera Cole
F. Anthony Paganelli, 18425-53
Aimee Rivera Cole, 24669-45
Joshua R. Lowry, 32676-29
PAGANELLI LAW GROUP
10401 N. Meridian St., Suite 450
Indianapolis, IN  46290
Tel:  317.550.1855
Fax:  317.569.6016
aimee@paganelligroup.com
Tony@paganelligroup.com
Josh@pagaelligroup.com

19

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been duly submitted to the Clerk of United States District Court of the Northern District of Indiana, Hammond Division, to be served along with the Summons on September 14, 2022, 2022. Additionally, the undersigned certifies that a copy of the Summons and Complaint and all related filings will be served via Federal Express, overnight mail on September 14, 2022, to the following:

Thomas J. Lemmen
1001 70th Place
Schererville, IN 46375

          */s/ Aimee Rivera Cole*
          Aimee Rivera Cole, 24669-45